# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BASEL ACTION NETWORK, a Sub-project of the Tide Center and SIERRA CLUB** | ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| v. | ) ) | **Civil Action No. 03-2000 (RMC)** |
| **MARITIME ADMINISTRATION, CAPT. WILLIAM G. SCHUBERT, in his official capacity, ADMINISTRATOR; and** | ) ) ) ) ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, MICHAEL LEAVITT, in his official capacity, ADMINISTRATOR** | ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM OPINION

The Maritime Administration ("MARAD") must dispose of decommissioned military vessels that constitute the Non-retention ships in the National Defense Reserve Fleet ("NDRF"). Congress requires that this disposal be completed by the end of fiscal year 2006. Approximately seventy (70) of these aging hulks are moored at the James River Reserve Fleet ("JRRF") in Virginia. When MARAD proposed to conduct tandem tows to move 13 of these ships to a shipbreaker in Teesside, United Kingdom in the fall of 2003, plaintiffs Basel Action Network ("BAN") and The Sierra Club filed this action, with a request for a temporary restraining order and preliminary injunction, on the grounds that the export of the vessels would violate several federal environmental laws. On October 2, 2003, this Court issued a temporary restraining order ("TRO" with respect to

nine of the thirteen ships, finding that MARAD had not completed an environmental assessment or

an environmental impact statement. *Basel Action Network v. Mar. Admin.*, 285 F. Supp. 2d 58

(D.D.C. 2003). Because MARAD had submitted the "functional equivalent"[1] of an environmental

assessment ("EA") to Congress for the four ships, their departure was not enjoined. *Id.*

Subsequently, at the parties' request, the TRO was modified to a preliminary injunction and a

briefing schedule was set for cross-motions for summary judgment, which are now pending before

the Court.

Having considered the record in its entirety, including the excellent briefs of the

parties, and oral argument, the Court concludes that Plaintiffs' complaint must be dismissed.

## I. BACKGROUND FACTS

The NDRF consists of government-owned merchant-type vessels of 1,500 gross tons

or more.[2] This includes the Ready Reserve Fleet – maintained in a state of readiness for

emergencies – and the Non-retention Reserve Fleet, which consists of obsolete vessels. The

National Maritime Heritage Act ("NMHA"), 16 U.S.C. § 5401 *et seq.*, authorizes MARAD to

dispose of obsolete NDRF vessels. Given their age (many are relics of the 1940s) and condition,

the National Defense Authorization Act for fiscal year 2001 set a September 30, 2006 deadline for

---

[1] *See Basel Action Network,* 285 F. Supp. 2d at 63 (*quoting Amoco Oil Co. v. EPA*, 501 F.2d 722, 749 (D.C. Cir. 1974)).

[2] Unless noted, the facts are not in dispute. "The NDRF consists of tankers, military auxiliaries, dry cargo vessels, and other types of ships . . . which includes 146 ships that have been designated as obsolete. . . . The James River Reserve Fleet (JRRF) in Virginia contains approximately 83 ships that are currently moored at the JRRF. Of this number, approximately 70 are within the MARAD inventory designated for disposal. The JRRF is located on the James River in southeastern Virginia. The JRRF is approximately 30 miles upstream from the Chesapeake Bay at Norfolk, Virginia and approximately 45 miles from the Atlantic Ocean." Final EA at 1-2.

MARAD to dispose of all obsolete vessels "in a manner that provides the best value to the Government, except in any case in which obtaining the best value would require towing a vessel and such towing poses a serious threat to the environment[.]"  16 U.S.C. § 5405(c).

In pursuit of this goal, MARAD initiated a competitive procurement program under the Federal Acquisition Regulations to solicit ship dismantling/recycling proposals from the ship breaking industry, both foreign and domestic.   This Program Research and Development Announcement ("PRDA"), published in September 2001, led to a contract for recycling awarded to Post-Service Remediation Partners, LLC.  This contract was later assigned to the subcontractor and parent corporation, AbleUK in Teesside, U.K.  The contract requires compliance with the laws of the United States and the United Kingdom to assure protection of the environment and worker health and safety.  The contract requires AbleUK to possess all licenses, permits, and approvals from local and national United Kingdom authorities required to tow the ships to its facility in the United Kingdom and to engage in vessel dismantling and recycling activities, including proper disposal of all hazardous materials.

When the tows of the four vessels allowed by the TRO commenced in the fall of 2003, AbleUK had all permits required to receive the vessels at its facility.  However, subsequent to the tow's departure from the United States, the United Kingdom Waste Management License and the local planning board approvals were determined to be inadequate in proceedings before the High Court Justice Queen's Bench Division, Administrative Court.  Rather than challenge these rulings, AbleUK has applied for a new waste management license and the necessary local planning approvals.  MARAD anticipated that all of these approvals would be received before the end of 2004; in any event, under the terms of the MARAD-AbleUK contract, AbleUK cannot engage in

any ship-breaking activities until it has all necessary licenses and approvals.

The CALOOSAHATCHEE, CANISTEO, CANOPUS, and the COMPASS ISLAND – all ships from the JRRF, also known as the "Ghost Fleet" – safely reached the United Kingdom and are moored at the AbleUK facility in Teesside. MARAD informs the Court that the United Kingdom Environmental Agency has been monitoring the vessels and has concluded, following a water and sediment quality review, that "there is no evidence that the presence of the four US Naval ships has caused a change in water or sediment quality in Seaton Channel or in the Tees Estuary." United States' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and In Support of Its Cross Motion for Summary Judgment ("U.S. Opp.") Ex. 4, US Navy Vessels in the Tees Estuary Water and Sediment Review, at § 7.

In the meantime, MARAD has still been working against a September 2006 deadline to dispose of the entire Ghost Fleet (and other Non-retention Reserve vessels). Of the remaining nine vessels subject to the AbleUK contract, the SANTA CRUZ, the AMERICAN BANKER, and the MORMACMOON have been contracted for scrapping by Marine Metal, Inc., of Brownsville, Texas. MARAD is considering domestic disposal proposals for the CAPE ISABEL, the MORMACWAVE, and the AMERICAN RANGE. Recycling at domestic sites will address the DONNOR and the PROTECTOR. Thus, only the RIGEL is still under consideration for export to AbleUK from the original list of 13. MARAD and AbleUK have modified the contract to identify 36 possible substitution vessels, including the RIGEL, but have not determined which of the 36 will actually be exported to Teesside.

MARAD also prepared a draft EA for the "Transfer of NDRF Vessels from the JRRF for Disposal at Able UK [sic] Facilities, Tee[s]side, U.K." AR 2493. The draft EA addressed each of the 9 remaining vessels from the initial contract between MARAD and AbleUK and also identified other vessels that could be considered for substitution. AR 2509, AR 2773D, 2774-75 [Tab 96]. The draft EA was issued in February 2004 and notice of it was placed in local newspapers and in the Federal Register. *See* 69 Fed. Reg. 9422-02 (Feb. 27, 2004); AR 2602. Sixteen comments, including comments from both Plaintiffs, were received. MARAD published a Final EA in May 2004, which included a response to the comments. AR Vol. 9, 2004 EA, App. E.

MARAD released a Finding of No Significant Impact ("FONSI") on June 29, 2004. AR 2773a. The FONSI concluded, "Based on the requirements, plans, and certifications that are required to be obtained prior to towing obsolete vessels, the potential environmental effects of the Proposed Action specifically, the potential for release of hazardous materials into the environment during tow activities[,] would not be significant" and would be adequately mitigated. AR 2773d.

## II.  STATUTORY BACKGROUND

### A.  The National Environmental Policy Act

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires federal agencies to consider the potential environmental impacts of major federal actions. *See* 42 U.S.C. § 4332(2)(C)(agencies should prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ."); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772-73 (1982). NEPA's mandate is "essentially procedural . . . . It is to insure a fully informed and well-considered decision . . . ." *Vermont Yankee Nuclear Power Corp. v. Nat'l Resources Defense*

*Council*, 435 U.S. 519, 558 (1978).  Regulations issued by the Council on Environmental Quality, 40 C.F.R. §§ 1500-1508, provide guidance on the application of NEPA.  These regulations are entitled to substantial deference from the courts.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355 (1989).

Agencies go through a two-step process in the application of NEPA.  First, they determine whether any proposed action is a "major Federal action[]" within the meaning of the statute and, presuming the answer to that question is in the affirmative, they prepare an EA to determine whether the action will "significantly affect[] the quality of the human environment," requiring the preparation of a much more detailed EIS.  *See* 40 C.F.R. 1501.4(b); *Anacostia Watershed Soc'y v. Babbit*, 871 F. Supp. 475, 482 (D.D.C. 1994); *see also Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003).  "If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary."  *Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985).  The parties do not dispute here that the export of 13 JRRF ships to Teesside, U.K. for ship breaking is a major federal action.

## B.  Toxic Substances Control Act

The Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.*, is designed to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use and disposal of certain chemical substances and mixtures. The Environmental Protection Agency ("EPA") is directed "to protect adequately against such risk using the least burdensome requirements," 15 U.S.C. § 2605(a), "in a reasonable and prudent manner . . . ."  15 U.S.C. § 2601(c).  Congress has given particular attention to polychlorinated biphenyls ("PCBs") because of their toxicity and because they are extremely long-lived in the

environment.[3] 15 U.S.C. § 2605(e); *see EDF v. EPA*, 636 F.2d 1267, 1271-72 (D.C. Cir. 1980)("The special attention accorded to PCBs in [TSCA] resulted from the recognized seriousness of the threat that PCBs pose to the environment and human health."). Congress banned the manufacture of PCBs after 1978 and the processing and distribution in commerce of PCBs after June 1979, except as exempted by rule upon submission of a petition to the EPA. 15 U.S.C. § 2605(e)(3)(A-C). Congress also directed the EPA to promulgate rules for the disposal of PCBs, 15 U.S.C. § 2605(e)(1)(A), to eliminate PCBs from the environment as well as the economy. *See Rollings Envtl. Servs. (FS), Inc., v. Parish of St. James*, 775 F.2d 627, 629-30 (5th Cir. 1985).

The EPA has carried out these directives and engaged in comprehensive rulemaking that covers the manufacture, processing, distribution in commerce, use and storage of PCBs, as well as their disposal. 40 C.F.R. Part 761, Subpart B; 44 Fed. Reg. 31, 514 (May 31, 1979). Because PCBs are toxic and yet persist in the environment for so long, PCBs can be exported only after EPA grants an exemption. In 1994, the EPA published a proposed rule that would allow the export of PCBs for disposal, including vessels that contain PCBs. 59 Fed. Reg. 62,788 (Dec. 6, 1994). While this rule has never been finalized, it has also not been withdrawn.

---

[3] "PCBs are a category of chemicals that were manufactured in the United States between about 1930 and 1977, predominantly for use as coolants and lubricants in electrical equipment, such as capacitors and transformers, due to their general chemical inertness and heat stability. PCBs are complex mixtures of chlorinated biphenyls that vary in the degree of chlorination. . . . [T]hey tend to persist with half-lives of months to years. PCBs bioaccumulate in food chains and are stored in fatty tissues due to their stability and lipophilicity." ATSDR - Toxicological Profile: Polychlorinated Biphenyls (PCBs), Agency for Toxic Substances and Disease Registry, www.atsdr.cdc.gov/toxprofiles/tp17.html (last visited Jan. 29, 2005).

### C.  Resource Conservation and Recovery Act

Subtitle C of the Resource Conservation and Recovery Act ("RCRA"), codified at 42 U.S.C. §§ 6921-6939e, establishes "a 'cradle-to-grave' regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste." *United Technologies Corp. v. EPA*, 821 F.2d 714, 716 (D.C. Cir. 1987).  RCRA was intended by Congress to "minimiz[e] the generation of hazardous waste and the land disposal of hazardous waste" by "encouraging process substitution, materials recovery, [and] properly conducted recycling and reuse . . . ."  42 U.S.C. § 6902(a)(6).

Before a material can be considered a "hazardous waste" subject to Subtitle C regulation, it first must be a "solid waste."  RCRA defines "solid waste" to mean:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations . . . .

42 U.S.C. § 6903(27).  In turn, a "solid waste" is a "hazardous waste" when it may "(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  *Id.* § 6903(5).

EPA regulations identify solid wastes as hazardous if they exhibit one of four characteristics: ignitability, corrosivity, reactivity, or toxicity.  *See* 40 C.F.R. §§261.20 through 261.24 (Part 261, Subpart C) (so-called "characteristic wastes").  Particular wastes are listed at 40 C.F.R. §§ 261.31 through 261.32 (Part 261, Subpart D) (so-called "listed wastes").  Only hazardous wastes identified by their characteristics in Part 261 Subpart C, or because they are listed in Part 261

Subpart D, are subject to RCRA's hazardous waste regulations. *Chemical Waste Mgmt., Inc. v. EPA*, 976 F.2d 2, 8 (D.C. Cir. 1992). The EPA has also promulgated regulations that identify certain exemptions and exclusions at 40 C.F.R. §§ 261.2 through 261.9. Of potential relevance here is the regulation at 40 C.F.R. § 261.6(a)(3)(ii), under which recyclable scrap metal is not subject to RCRA hazardous waste regulations.

### D.  OECD Decision

The Organization for Economic Cooperation and Development ("OECD"), an international organization of which the United States is a member, adopted Council Decision C(92)39/FINAL on March 30, 1992, Concerning the Control of Transfrontier Movements of Wastes Destined for Recovery Operations (the "OECD Decision").[4] The OECD Decision created three tiers of waste – green, red, and amber – as a graduated control system for the movement of wastes across international borders. On April 12, 1996, the EPA promulgated a final rule at 40 C.F.R. Part 262, Subpart H, to implement the terms and obligations of the OECD Decision. 61 Fed. Reg. 16, 290 (Apr. 12, 1996).

### E.  Administrative Procedure Act

Plaintiffs rely on the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, as the basis for their claims under NEPA and, when the litigation began, for claims under the National Maritime Heritage Act ("NMHA")[5] and TSCA. Neither NEPA nor NMHA creates an

---

[4] This OECD Decision has since been amended by the OECD Amended Council Decision C(2001)107/FINAL. EPA RCRA regulations adopted the OECD Decision in 1996 and the parties (and the Court) therefore continue to reference the 1992 OECD Decision.

[5] Because Plaintiffs do not rely on NMHA in their motion for summary judgment, the Court deems those claims withdrawn.

independent cause of action, and claims under either statute can be pursued only under the APA. *See Town of Stratford v. FAA*, 285 F.3d 84, 88 (D.D.C. 2002).  By contrast, TSCA and RCRA provide a right to judicial review through citizen suits.  *See* 15 U.S.C. § 2619 (TSCA) and 42 U.S.C. § 6972 (RCRA).  When a statute provides for direct review, jurisdiction does not normally lie under the APA.  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

The APA allows review of final agency action or action improperly withheld.  4 U.S.C. §704; s*ee also Sierra Club v. Thomas*, 828 F.2d 783, 793-95 (D.C. Cir. 1987).  Agency actions will be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A,C).  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971); *Louisiana Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1117 (D.C. Cir. 1992); *National Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987).

### III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In determining whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *See*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). Once the moving party shows that there is a lack of evidence to support the opponent's case, the burden shifts to the non-movant to demonstrate, through affidavits or otherwise, the existence of a material issue for trial. *See Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). Conclusory allegations by the non-movant are insufficient to withstand summary judgment. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999); *Banks v. Chesapeake and Potomac Tel. Co.*, 802 F.2d 1416, 1430 n.24 (D.C. Cir. 1986).

## IV. ANALYSIS

### A. Plaintiffs' Standing

First and foremost, MARAD challenges the standing of these plaintiffs to bring this suit. Because the federal courts are courts of limited jurisdiction, a plaintiff's standing under Article III of the United States Constitution must first be determined to establish the jurisdiction of the Court to hear the case and reach the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-96, 104 (1998); *Grand Council of the Crees v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000).

To have Article III standing, a plaintiff must establish: (1) that it has suffered an "injury in fact – an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) that its injury is fairly traceable to the challenged action of the defendant, and not the result of the "independent action of some third party not before the court;" and (3) that it is "likely as opposed to merely speculative" that the plaintiff's injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The nature of the injury when a plaintiff is alleging a procedural violation

-11-

(as these Plaintiffs allege that MARAD violated NEPA by not performing an adequate EA and TSCA by not obtaining an EPA exemption for toxic exports) differs in kind, but must still show that "it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (*en banc*).

The Sierra Club argues that it has standing because a release of pollutants from one of the vessels "into the James River, Chesapeake Bay, or open waters would diminish one Sierra Club member's enjoyment of boating, swimming and fishing in these areas, and make him concerned for the health of his family." Pls.' Mem. at 8. Similar arguments are advanced for a "member of one of BAN's member organizations: who resides in Virginia." *Id.*; *see also id.*, Ex. 1 (Declaration of Linda King) at ¶ 3 ("Many of our members [of the Virginia Organizing Project] recreate on the Lower James River and Chesapeake Bay. Our membership includes people who birdwatch, fish, harvest shellfish, boat, and swim in the Atlantic Ocean, Chesapeake Bay, and the tributaries of the Bay.").[6] MARAD offers various challenges to the soundness of these statements for supporting Plaintiffs' standing. After giving thorough consideration to each challenge, the Court finds that The Tides Center, the real party-in-interest behind BAN, lacks standing to pursue this suit. However, the interests of The Sierra Club's members are sufficiently engaged; the alleged threat of harm is sufficiently imminent and remediable; and The Sierra Club, therefore, has adequate standing for purposes of Article III.

---

[6] The Court notes that the activities of the members of the Environmental Health Network, of which Declarant King is Executive Director, are irrelevant to the question of whether BAN has standing here since the EHN does not claim to be a member of BAN.

### 1.  Are the risks too speculative for standing?

MARAD first argues that the alleged risk from a release of pollutants is too speculative to provide standing for Plaintiffs.  "Because no actual release is alleged by Plaintiffs, they must instead set forth facts showing a '*demonstrable* increase of an existing risk' that a release would occur."  U.S. Opp. at 16 (citing *Fla. Audubon*, 94 F.3d at 666)(emphasis in original). MARAD relies on the 2004 EA and its detailed explanations concerning the numerous steps taken to ensure navigational safety during the tow, asserting that these facts belie any suggestion of a demonstrable increase of risk.  Similarly, MARAD points to its history of approximately 173 successful cross-ocean tows in the past, cited in the 2004 EA.  The problem with these arguments, of course, is that the lawsuit began with the purpose of compelling MARAD to prepare an EA, which did not exist at the time.  Just because MARAD has now completed an EA, allowing public participation and input, and a consideration of the relevant information, Plaintiffs are not deprived of their rights *ab initio* to demand compliance with the law.  This part of MARAD's argument comes closer, in its fundamentals, to a claim of mootness rather than an attack on Plaintiffs' Article III standing.

### 2.  Would a court be able to remedy these claims?

MARAD also challenges the redressability of Plaintiffs' claims. It argues that Plaintiffs "do not explain how dismantling the vessels at a local disposal facility in the same vicinity where declarants recreate would somehow *decrease* the risk that a release would harm those interests." U.S. Opp. at 18.  However, Michael Town, a member of The Sierra Club, asserts that the ships should be removed from the James River and broken and recycled at a shipyard as close as possible to the James River to mitigate the transportation risks.  Declaration of Michael Town

("Town Decl.") ¶8; *see also* Supplemental Declaration of Werner Hoyt ("Hoyt Decl.") ¶3.  While the Court agrees that a philosophical opposition to exporting JRRF ships to the United Kingdom is not relevant to MARAD's compliance with federal environmental laws, there is still a legitimate connection between local environmental concerns in the area in which Mr. Town recreates and the risks of dead-ship tows.  Plaintiffs claim there is a greater likelihood that hazardous chemicals will be released during an international towing operation as opposed to a domestic operation.  *See* Hoyt Decl. ¶4 ( "[T]ow vessels are not typically manned with sufficient personnel to repair damage that occurs while underway. During an ocean crossing, this means that damage often goes unrepaired, sometimes resulting in leaks and/or more catastrophic problems. However, vessels towed to domestic ship-breaking facilities are never so far from shore that they cannot either obtain repair assistance from coastal personnel or be towed into port for repairs there.").

In addition, based on the geographic location of the JRRF vessels, it is likely that, if hazardous chemicals were indeed released, an international tow could cause more damage to Virginia waters.  If the vessels were towed to domestic ship-breaking facilities, the potential of harm to *Virginia* waters would be minimal because the vessels would almost certainly be towed south.  Conversely, an international tow would cause a tow of the vessels north along the Delmarva Peninsula coast before heading across the Atlantic Ocean.  Thus, if The Sierra Club prevails, an injunction enjoining MARAD from towing vessels to the UK could remedy its substantive claims by reducing the risk of contamination to Virginia waters.

### 3. Does BAN have associational standing?

The status of BAN as a litigant requires careful parsing of its organization.[7]  A "sub-project of the Tides Center," BAN "is an international network of environmental activists working worldwide to prevent environmental injustice and harm. . . . BAN is administered as a project of the Asia Pacific Environmental Exchange, Seattle, which is in turn a project of the Tides Center, San Francisco. . . . BAN is made up of over 30 organizations worldwide[,]" one of which is the Virginia Organizing Project ("VOP").  Pls' Mem. at 20.   The Tides Center is a nonprofit charitable organization under the Tax Code, 26 U.S.C. § 501(c)(3), incorporated under the laws of California as a Nonprofit Public Benefit Corporation.  Pls.' Reply, Ex. 5.  Under California law, it has the capacity to sue, Cal. Corp. Code § 5140, and therefore has the capacity to sue under Federal Rule of Civil Procedure 17(b)(capacity of corporation to sue determined by the law of the state of incorporation).  On an organizational chart, the Tides Center would be at the top, with a series of approximately 350 Projects under it.  One such Project is the Asia Pacific Environmental Exchange in Seattle.  Under each Project is one or more Sub-Projects.  BAN is a Sub-Project under the Asia Pacific Environmental Exchange Project.

When MARAD initially challenged BAN's capacity to sue, BAN responded that the real party in interest is the Tides Center.  BAN submitted a resolution from that organization authorizing BAN to maintain this suit.  "By identifying itself in its complaint and all other filings in this case as 'Basel Action Network, a Sub-Project of the Tides Center,' the Tides Center intended to convey the fact [that] it is the real party in interest in this case."  Pls.' Reply at 19.  A real party-in- interest can either be substituted by an amended complaint or it can submit a formal ratification

---

[7]  MARAD does not challenge the associational standing of the Sierra Club.

of the action, authorizing its continuation and agreeing to be bound by its result.  *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992).  Such ratification validates the action from the outset, just "as if the action had been commenced in the name of the real party in interest."  Fed. R. Civ. P. 17(a).  Cure by ratification meets Rule 17's goal of "protect[ing] the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata."  *See Mutelles Unies*, 957 F.2d at 712 (*citing* Rule 17(a) advisory committee note).  For purposes of the instant analysis, it is the "real party in interest," *i.e.*, the Tides Center, whose standing is under scrutiny.

"[A]n association has standing to sue on behalf of its members 'when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988) (*citing Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).  In *New York State Club Ass'n*, the Supreme Court extended the associational standing analysis from *Hunt* to include an association of associations.  That is, a plaintiff association can be made up of other associations who, in turn, have individual members, and still meet the standing requirements articulated in *Hunt*.  *See id.* at 9 ("[T]he appellant consortium has standing to sue on behalf of its member associations as long as those associations would have standing to bring the same challenge . . . on behalf of their own individual members . . . .").

It is conceded, however, that the Tides Center has no members.  U.S. Reply Ex. 9 (Tides Center has "no members" according to an amendment to its articles of incorporation); Pls.' Surreply at 2 (same).  Therefore, it has no associational standing under the *Hunt* or *New York State*

-16-

*Club Ass'n* parameters.

However, an organization with no formal members can still have associational standing if it "is the functional equivalent of a traditional membership organization." *Fund Democracy LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002); *see also Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991, 991 (D.C. Cir. 1996). Three main characteristics must be present for an entity to meet the test of functional equivalency: (1) it must serve a specialized segment of the community; (2) it must represent individuals that have all the "indicia of membership" including (i) electing the entity's leadership (ii) serving in the entity, and (iii) financing the entity's activities; and (3) its fortunes must be tied closely to those of its constituency. *Fund Democracy*, 278 F.3d at 26 (citing *Hunt*, 432 U.S. at 344-45). In *Hunt*, the Supreme Court noted that although the Washington State Apple Advertising Commission did not have members in a traditional sense, the State's apple growers and dealers possessed all the "indicia of membership" in an organization because the Commission "provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 344-45. Accordingly, the Court held that the Commission's status as a State agency, as opposed to a traditional voluntary membership organization, did not preclude it from asserting the claims of the State apple growers and dealers. *See id.* at 345.

The relevant inquiry here is whether the Tides Center has similarly demonstrated sufficient "indicia of membership" to meet the associational standing requirements articulated in *Hunt. See Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 50 n. 12 (D.D.C. 1998)("The threshold requirement for even applying this test [in *Hunt*] is that the organization has actual members or indicia of membership."). The Tides Center consists of "more than 350 projects across

the country." U.S. Reply, Ex. 10. "All paid staff of an individual sponsored project are legally employed by Tides Center." *Id*. at Ex. 11. The Tides Center "processes all financial transactions on behalf of its sponsored projects." *Id*. There is no evidence that the Projects or Sub-Projects exercise any control over the organizational direction of the Tides Center. These facts stand in stark contrast to the facts in *Hunt*, in which the apple growers and dealers "alone elect the members of the [State Apple] Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Hunt*, 432 U.S. at 344-45. Here, as in *American Legal Foundation v. FCC*, 808 F.2d 84 (D.C. Cir. 1987), there is no showing that the Projects or Sub-Projects "play any role in selecting [its] leadership, guiding [its] activities, or financing those activities" of the Tides Center. *Id*. at 90; *see also Fund Democracy*, 278 F.3d at 26 ("informal consortium" of groups of mutual fund investors lacked associational standing). Contributors contribute financial support directly to the Projects and Sub-Projects. There is no indication that the contributors to the Projects and Sub-projects have any control over the direction or organization of the Tides Center.

        BAN misreads this argument advanced by MARAD. While acknowledging that "the Tides Center has no formal members," Pls.' Surreply at 2, it responds that BAN itself has sufficient indicia of membership to have associational standing. *Id*. at 2-3. The flaw in this argument is that BAN is not the "real party-in-interest" and has no legal capacity to sue. It is axiomatic that standing must be determined by the identity and characteristics of the plaintiff(s). *See Health Research Group v. Kennedy*, 82 F.R.D. 21, 24-26 (.D.C. 1979); *see generally Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). A Project or Sub-Project of the Tides Center is an activity, not a separate entity.

Because the Tides Center has no associational standing to sue, it must be dismissed. This does not dispose of the case, however, because The Sierra Club admittedly has associational standing.

### B.  Compliance With NEPA

The Court concludes that the 2004 EA and FONSI prepared by MARAD fully met its obligations under NEPA.  Accordingly, Plaintiff's complaint allegations relating to NEPA will be dismissed.

The D.C. Circuit has established four criteria for reviewing an agency's decision not to prepare an EIS: "(1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there were an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum." *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983); *see also Maryland-Nat'l Capital Park & Planning Comm'n v. United States Postal Serv.,* 487 F.2d 1029, 1040 (D.C. Cir.1973).  The D.C. Circuit has identified these steps in order:

> First, the agency [must] accurately identif[y] the relevant environmental concern.   Second, once the agency has identified the problem it must . . . take[] a 'hard look' at the problem in preparing the EA.  Third, if a finding of no significant impact is made, the agency must . . . make a convincing case for its finding.  Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003); *accord Grand Canyon Trust v. F.A.A.*, 290 F.3d 339 (D.C. Cir. 2002).

The Sierra Club challenges the 2004 EA as failing to consider the impacts of towing

ships across the high seas, failing to analyze each ship separately, and inadequately considering the alternative use of only domestic ship-breakers.  These will be addressed in turn.

### 1.  Consideration of extraterritorial effects

Plaintiffs argue that MARAD failed to take the requisite "hard look" at the environmental effects of towing JRRF ships across the high seas. Pls.' Reply at 42; *see* 33 C.F.R. § 2.05-1(a) (The high seas are "all waters which are neither territorial seas nor internal waters of the United States or any foreign country.").[8]  However, NEPA does not require such an analysis.

Unless specified, there is a presumption that laws passed by the U.S. Congress have no extraterritorial effect.  *Smith v. United States*, 507 U.S. 197, 204 (1993)("[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.")(internal citations omitted).  "[T]he presumption is rooted in a number of considerations, not the least of which is the common sense notion that Congress generally legislates with domestic concerns in mind."  *Id.* at 204 n.5; *see also Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 173 (1993)(noting that even if the statute in question "were not limited to strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would support an interpretation of [the statute] as applying only within United States territory.").  The Sierra Club offers no basis in law to refuse to apply this customary presumption when applying

---

[8]  The 2004 EA studied the environmental impact of the proposed tows on water quality associated with: "the area around Jamestown upstream of Fort Eustis on the James River downstream to the confluence of the river with the Chesapeake Bay; the western shore of the Chesapeake Bay from Hampton north to the mouth of the James River and from Norfolk east to Willoughby Bay; the western shore of the Chesapeake Bay from Fisherman's Island north to Cape Charles; and the Atlantic coastline from the mouth of the Chesapeake Bay south to Virginia Beach and north to Capeville and outward to the seaward extent of U.S. Territorial Waters." 2004 EA at 43-44.

NEPA to these facts.

The application of the customary presumption against the application of NEPA outside of U.S. territorial waters is bolstered by the fact that Congress *has* legislated in the area of exporting toxic and hazardous wastes by way of TSCA and RCRA. *See* 15 U.S.C. § 2605 (TSCA) and 42 U.S.C. § 6938(a) (RCRA). Given the express terms of these two specific environmental laws, the Court finds that there is no legal or policy reason to extend NEPA to the high seas.

*Environmental Defense Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993), does not require a different conclusion. In *Massey*, the D.C. Circuit held that NEPA applied to the incineration of food waste in Antarctica. The D.C. Circuit did not apply the presumption against extraterritoriality because the regulated conduct – the decision-making process, in that case – occurred within the United States; because the U.S. has legislative control in Antarctica; because there was no potential for conflict with the laws of other countries; and because the presumption applies with less force in a "sovereignless region like Antarctica." *Id.* at 534.[9] The power of *Massey* remains unclear in light of *Smith* and *Sale*. *Smith* rejected the argument that the presumption against extraterritoriality does not apply in a sovereignless region where there are no "unintended clashes between our laws and those of other nations which could result in international discord." *Smith v. United States*, 507 U.S. at 204 n.5 (internal quotations and citations omitted). The Court in *Sale* agreed. 509 U.S. at 173. Assuming nonetheless that *Massey* requires a specific analysis of how its

---

[9] None of these considerations applies to Teesside, U.K., where NEPA clearly does not apply. Not only are Teesside and the Tees Estuary located in a separate sovereign nation where the U.S. has no control, but the United Kingdom has its own Environmental Agency and regulations, which it is applying to AbleUK and any ships transported there. *See Born Free USA v. Norton*, 278 F. Supp. 2d 5, 19-20 (D.D.C. 2003), *vacated as moot*, No. 03-5216, 2004 WL 180263 (D.C. Cir. Jan. 21, 2004) (*per curiam*); *NEPA Coaltion of Japan v. Aspin*, 837 F. Supp. 466 (D.D.C. 1993).

factors apply here, the Court finds it readily distinguishable.

Perhaps most important, the decision to engage in transatlantic tandem towing of dead ships is made by MARAD in the United States.  In addition, there is little likelihood that application of NEPA on the high seas would conflict with another nation's laws.  However, the United States does not have legislative control over the high seas and the Supreme Court instructs that the presumption against extraterritoriality applies with equal vigor in "sovereignless" areas.  *See Smith,* 507 U.S. at 204 n.5.  Thus, two of the four factors relied upon by the D.C. Circuit in *Massey* are not present here to contradict the presumptive limitation of U.S. law to U.S. territory.

### 2.  MARAD Took a "Hard Look"

In its TRO, this Court stated that "[b]efore sending any additional NDRF vessels through the Chesapeake Bay and United States coastal waters, MARAD must perform, at a minimum, a supplemental EA specific to [the remaining nine] ships that addresses the environmental impact of such action in the United States."  *Basel Action Network,* 285 F. Supp. 2d at 63.  The Sierra Club complains that the 2004 EA fails in this task because it does not contain individualized inventories of the hazardous waste aboard each ship or an analysis of the hull condition of each vessel.  It seeks a detailed hazardous material inventory for each of the 36 ships that MARAD may substitute for the ships originally identified in the contract with AbleUK and named in the EA.  *See* Pls.' Reply at 42.

Instead of a ship-by-ship analysis of the original nine or the new group of 36 ships that may be towed to AbleUK, the 2004 EA identified and considered the types of materials likely to be found aboard the ships, the places they would be found, and the likely quantities.

> For example, the EA describes the hexavalent chromium, which "[f]or many years . . . was used as a corrosion inhibitor in ballast water." [2004

> EA at E-6.] In MARAD's experience, the chemical "has not been an issue
> in ballast water of ships being dismantled nor has it ever been found in
> ballast mud." *Id.* at E-7.  Even so, MARAD explained that in the event it
> were found aboard a vessel, it "may persist but will react with organic
> matter to form trivalent chromium, which will eventually precipitate out."
> *Id.*  This compound, MARAD further explained, "does not bioaccumulate
> in plants or animals and appears to have little toxic impact when ingested
> by humans." *Id.*

U.S. Reply at 15.  Similar identification was undertaken for other hazardous materials, including

asbestos, mercury, ozone depleting substances ("ODS") and PCBs.  2004 EA at 34, E-7.  To support

its approach, MARAD relies on its expertise in dealing with the Reserve Fleet and its dilemma in

preparing an EA under circumstances where, inevitably, there would be some substitution of ships.

Recognizing both, the Court finds that the 2004 EA represents a reasoned "hard look" at the kinds

of materials found onboard that are *"typical* of vessels of a similar age and type/class, as they

represent construction and operational materials that were used extensively in the shipbuilding and

ship operations industry at the time that the vessels were built."  *Id.* at 55 (emphasis added).

      The Sierra Club's claim that MARAD failed to assess the environmental effects of

dead-ship towing on water quality is inaccurate.  To be sure, MARAD assessed only the impacts in

U.S. territorial waters, contrary to the position of The Sierra Club, but it found that moving the ships

would have no impact on sediments in the James River and that the no-action alternative (which no

one wants, and which is not available given MARAD's congressionally-imposed deadline) would

increase the risks of a potential oil spill due to leakage from the deterioration of stationary vessels.

*See* 2004 EA at 44.  As indicated above, NEPA does not apply beyond U.S. territorial waters.  The

limitation in the 2004 EA to studying water quality only within U.S. waters complies with the law.

      Worried about a history of "prior failed trans-oceanic dead tow attempts," *see*

Comments to 2004 EA at 40, The Sierra Club argues that MARAD must perform an "in-depth

analysis of causes" of certain historic tow accidents. It also argues that MARAD failed to take a "hard look" at the effectiveness of its mitigation measures. Pls.' Reply at 40 n.34, 42. The Court concludes that MARAD reasonably did not study the past towing incidents, most of which involved foreign-registered vessels of unknown condition, not subject to Coast Guard requirements, that sank in other parts of the globe. The Sierra Club identified sinkings in the Pacific Ocean, off southeast South Africa, in the Sea of Japan, the Caribbean Sea, the Barents Sea, and en route to India. AR 2648-49. These locations have nothing to do with the route between the James River and Teesside U.K. Since NEPA does not apply to the open seas, the Court cannot find that study of these incidents – far removed from the proposed tows here – was a necessary precursor to completion of the FONSI. Only one of the vessels identified by The Sierra Club involved a MARAD tow, the USS WAYNE VICTORY. The parties dispute the nature of the incident involving this ship. *Compare* AR 2649 (WAYNE VICTORY'S "hull cracked open") *with* U.S. Reply at 17 n. 9 ("[T]wo J-hook patches that covered existing holes in the hull were loose and allowed some water to enter the hull. The patches were repaired at sea and stopped additional water from entering the hull."). This single incident did not create a NEPA obligation to study the WAYNE VICTORY tow en route to Texas, U.S. Reply at 17 n. 9, in order to tow ships from the JRRF to Teesside U.K.

The Court also concludes that MARAD took the requisite "hard look" at its mitigation measures before it issued the FONSI. The Coast Guard at Hampton Roads, Virginia, has been conducting a "formal dead-ship tow review and approval process" since May 2001 and has concluded that 103 vessels have been dead-ship towed through December 2003 without any known pollution incidents. *See* 2004 EA at 57, E-8. MARAD itself has a history of successful overseas towing, which supports its evaluation of these mitigation measures: "Between 1983 and 1994 (when

foreign sales were halted), approximately 173 MARAD vessels were towed to overseas locations for scrapping" without any losses during the tows.  *Id.* at E-10 to E-11.  These selfsame mitigation measures were also utilized in the tandem tow of the four ships exported in October 2003 that ultimately arrived safely in Teesside.

### 3.   Alternative Domestic Ship-breakers

MARAD has two explicit orders from Congress: (1) dispose of the Non-retention Reserve Fleet by December 2006 and (2) do so in a manner that achieves the "best value" for the Government.  *See* 16 U.S.C. § 5405(c).  The Sierra Club argues that the FONSI is inadequate because it limited its consideration to only two alternatives: (1) tandem tows to the U.K. and (2) take no action.  Pls.' Mem. at 28-31; Pls.' Reply at 42-43.  Citing *Citizens Against Burlington, Inc. v. Bussey*, 938 F.2d 190, 196 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994 (1991), The Sierra Club asserts that an "agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative in the agency's power would accomplish the goals of the agency's action." Pls.' Reply at 42.  It demands that MARAD more fully consider domestic ship-breakers.

When the underlying facts of this matter are considered, it becomes evident that this argument is not properly advanced as a NEPA claim against an inadequate FONSI, but rather a policy disagreement as to whether MARAD should be exporting ships for disposal at all.  First, MARAD is, indeed, relying on domestic ship-breakers to help meet its 2006 deadline.  *See* 2004 EA at 6-7, 16.  MARAD determined, however, that it could not limit itself simply to domestic scrapping if it were to meet this deadline.  *See* 2004 EA at E-5 ("In order to achieve the best value and expedited disposal, the broadest competition and industrial capacity is necessary.").  This approach has been specifically sanctioned by Congress, which lifted the ban on exporting these vessels

containing PCBs just so that MARAD could solicit and consider foreign bids. *See* Bob Stump

NDAA for Fiscal Year 2003, Pub. L. No. 107-314, § 3504(c), 116 Stat. 2458 (2002). The issue

requiring the 2004 EA was exactly the one studied and considered by MARAD: tandem towing out

of the JRRF to the Atlantic Ocean *or not*. It cannot be gainsaid that Congress, MARAD, residents

in the James River area[10], BAN, and The Sierra Club all want these aging ships expeditiously broken

and recycled. If tandem towing can be safely accomplished without environmental harm, exporting

some number of ships to a foreign ship-breaker will hasten the process. In context, there were only

two alternatives necessary for the 2004 EA to consider, particularly since MARAD is already

relying on The Sierra Club's preferred alternative of domestic ship-breaking.

   Lastly, the Court agrees that MARAD could reasonably rely upon its own

commitment that "[i]n *no case* will ship disposal actions begin until the [United Kingdom

Environmental Agency] has fully approved AbleUK to receive and process the vessels." 2004 EA

at 58 (emphasis added). The 2004 EA discussed fully the nature of the permits that AbleUK must

obtain from its own government. *Id.* at 13, 58. More than that is not required because neither

MARAD nor any other agency or department of the U.S. Government has control or responsibility

for those licenses and permits in a separate sovereign nation. *See Born Free*, 278 F. Supp. 2d at 19-

20; *Aspin*, 837 F. Supp. at 467; *see also Citizens Against Rails to Trails v. Surface Transp. Bd.*, 267

F.3d 1144, 1152 (D.C. Cir. 2001) (lack of federal control removes action from NEPA's reach); 40

C.F.R. § 1508.18 (defining "major federal action" as "actions with effects that may be major and

which are potentially subject to Federal control and responsibility.").

---

[10] *See Clark v. U.S. Mar. Admin., et al.,* No. 04-49 (E.D. Va.).

The complaint allegations arising under NEPA will be dismissed.

**C.  Compliance with TSCA**

Plaintiffs provided their notice of intent to sue under TSCA on September 8, 2003 and filed their original complaint on September 26, 2003, less than sixty (60) days later.  Plaintiffs' complaint clearly asserted a violation of TSCA.  Compl. ¶ 1 ("This action is brought under the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* (TSCA) and its implementing regulations."); Compl. at ¶ 4 (summarizing allegations of TSCA violations).  The initial complaint attempted to bring these TSCA claims under the APA to avoid the 60-day notice period in the citizen's suit provision of TSCA.  Compl. at ¶¶ 35-36.  After sixty days had passed, Plaintiffs filed an amended complaint to bring their TSCA claims directly under that law.

Having failed to forego suit until after the full 60 days had passed, Plaintiffs have failed to comply with the terms by which the United States has waived its sovereign immunity.  Accordingly, their TSCA allegations must be dismissed.

The civil suit provision of TSCA provides that:

No civil action may be commenced –

(1) under subsection (a)(1) of this section [relating to suits against any person (including the United States)] to restrain a violation of this  chapter or rule or order under this chapter

(A) before the expiration of 60 days after the plaintiff has given notice of such violation (i) to the Administrator, and (ii) to the person who is alleged to have committed such violation.

15 U.S.C. § 2619(b)(1).  This 60-day notice period is mandatory and cannot be waived.  *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989)(interpreting similar RCRA clause in the absence of

statutory exception).[11]  The Court expressly rejected the argument that an equitable exception should

exist for immediate relief:

> [P]etitioners, with amici, contend that strictly enforcing the 60-day delay
> provision would give violators an opportunity to cause further damage or
> actually accomplish the objective that the citizen was attempting to stop.
> *See, e.g., Save Our Sound Fisheries Assn. v. Callaway*, 429 F. Supp. 1136,
> 1142-1145 (R.I. 1977) (Army Corps of Engineers violated three
> environmental statutes in order to award dredging contract before citizen
> suit to enjoin dredging could commence).  Similarly, they assert that courts
> would be precluded from giving essential temporary injunctive relief until
> 60 days had elapsed.  Although we do not underestimate the potential
> damage to the environment that could ensue during the 60-day waiting
> period, this problem arises as a result of the balance struck by Congress in
> developing the citizen suit provisions.  Congress has addressed the dangers
> of delay in certain circumstances and made exceptions to the required
> notice periods accordingly [examples omitted].

*Hallstrom*, 493 U.S. at 29-30.  Particularly when the United States is the defendant, such mandatory

provisions must be strictly construed because they waive sovereign immunity.  *Lane v. Pena*, 518

U.S. 187, 192 (1996)(noting that waivers of sovereign immunity "will be strictly construed, in terms

of its scope, in favor of the sovereign.").

Plaintiffs' defective notice cannot be cured by the filing of an amended complaint

after the required notice period.  *See Garcia v. Cecos Int'l, Inc.*, 761 F.2d 76, 82 (1st Cir. 1985)

(*cited with approval in Hallstrom*, 493 U.S. at 30-31):

> Permitting immediate suit ignores the possibility that a violator or agency
> may change its mind as the threat of suit becomes more imminent.  After
> the complaint is filed the parties assume an adversary relationship that
> makes cooperation less likely.  Because a mere adjustment of the trial date
> or the filing of a supplemental or amended complaint to cure the defective

---

[11]  The Supreme Court expressly noted that the same analysis would apply to the citizen
suit provisions of TSCA.  *Hallstrom*, 493 U.S. at 23 n.1.  The 60-day notice provision in RCRA
does not bar Plaintiffs' RCRA claims here because there is an exception for claims alleging
violations of Subchapter III dealing with hazardous waste.

> notice cannot restore a sixty-day non-adversarial period to the parties, we
> would therefore dismiss suits where the complaint is filed less than sixty
> days after actual notice to the agency and the alleged violators.

*See also Supporters to Oppose Pollution, Inc. v. The Heritage Group*, 760 F. Supp. 1338, 1341-42

(N.D. Ind. 1991), *aff'd*, 973 F.2d 1320 (7th Cir. 1992)("The holding in *Hallstrom* that notice is a

condition precedent to suit does not state whether any related litigation may proceed during the

notice period, but it does not seem to contemplate a scenario in which parties would be litigating

factually-related issues during the notice period.  It appears that *Hallstrom* does require a non-

adversarial period within which the alleged violator or the state or federal agency may achieve

compliance with the RCRA.").  The Seventh Circuit's affirmance of *Supporters to Oppose Pollution*

suggests that the circuit has moved away from *Chicago Ass'n of Commerce and Indus. v. EPA*, 873

F.2d 1025 (7th Cir. 1989), a pre-*Hallstrom* decision that permitted a subsequent amendment to a

complaint to cure a defective notice.  In light of *Hallstrom*, the analysis of *Chicago Ass'n of

Commerce and Indus.* does not withstand scrutiny.

Recognizing the problem here, the initial complaint presented the TSCA claims as

arising under the APA instead of under TSCA itself.  This disguise is unsuccessful.  APA

jurisdiction is dependent upon the lack of an alternative adequate remedy.  *Bowen v. Massachusetts*,

487 U.S. 879, 903 (1988) (APA does not duplicate specific agency-review procedures).  For these

reasons, judicial review under the APA is precluded when a remedy is available under a citizen suit

provision of an environmental statute.  *Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001)

(Clean Water Act); *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1257 (1st Cir. 1996)

(Clean Air Act); *Allegheny County Sanitary Auth. v. EPA* , 732 F. 2d 1167, 1177 (3rd Cir. 1984)

(Clean Water Act); *Kingman Park Civic Ass'n v. EPA* , 84 F. Supp. 2d 1, 9 (D.D.C. 1999) (Clean

Water Act); *Building Indus. Ass'n of Southern California, Inc. v. Lujan*, 785 F. Supp. 1020, 1021

(D.D.C. 1992) (Endangered Species Act); *Envtl. Defense Fund v. Tidwell*, 837 F. Supp. 1344, 1355-

57 (E.D.N.C. 1992) (Clean Water Act). When Congress provides a direct remedy through a citizen's

suit provision, no other right of action can be implied. *See Middlesex County Sewerage Auth. v.

Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17-18 (1981); *Bd. of Trustees of Painesville Township v. City

of Painesville*, 200 F.3d 396, 399 (6th Cir. 1999); *Tidwell*, 837 F. Supp. at 1356.

   Plaintiffs argue that a suit under TSCA's citizen-suit provisions was not available

during the 60-day notice period so it was necessary to proceed under the APA. However, the

acceptance of such an argument would defeat the purpose for the required notice period in citizen

suit provisions – to allow a non-adversarial period during which the alleged violator may remedy

the problem or the agency may choose to initiate an enforcement action. *Hallstrom*, 493 U.S. at 32.

Furthermore, allowing Plaintiffs to proceed under the APA would allow them to circumvent the

statutory notice requirement under the citizen suit provision in TSCA simply by styling their claims

as claims that arise under the APA. *See Oregon Natural Res. Council v. United States Forest Serv.*,

834 F.2d 842 (9th Cir. 1987)("Where plaintiffs may otherwise proceed under the citizen suit

provision, they should not be allowed to bypass the explicit requirements of the Act established by

Congress through resort to . . . the APA."). Thus, while Plaintiffs insist that proceeding under the

APA was their only recourse, the reasoning of *Hallstrom* and *Garcia* answer this argument fully:

Congress has adopted a particular and specific balance of interests in requiring a 60-day non-

adversarial period prior to suit, which cannot be avoided by legerdemain.[12]

---

  [12] At the time of the TRO, the Court expressly did not rule on the applicability of the
APA to circumvent the citizen suit provisions of TSCA. *Basel Action Net work v. Mar. Admin.*,
285 F. Supp. 2d 58, 61 & 62 (D.D.C. 1003). However, the Court did note that, at the time

### D.  Compliance with RCRA

The Second Amended Complaint states that "MARAD's plan to export RCRA-regulated toxic and hazardous waste for disposal and/or recovery in the United Kingdom without regard for the requirements of RCRA, 42 U.S.C. § 6938; [and] 40 C.F.R. §§ 262.58, 262.80-89, is actionable under 42 U.S.C. § 6972."  Second Am. Compl. ¶ 14.[13]  At 42 U.S.C. § 6938, cited in the Second Amended Complaint, the statute requires an exporter of hazardous waste to give prior notice to the Administrator of the EPA and obtain the receiving country's written permission to receive the waste.  *See*  Second Am. Compl. ¶¶ 39- 44, 55 - 61.  From these allegations, MARAD deduces that the complaint's RCRA allegations are based on RCRA's provision at 42 U.S.C. §6972(a)(1)(A), which authorizes a civil  action against any person, including the United States, "who is alleged *to be in violation* of any permit, standard, regulation, condition, requirement, prohibition, or order, which has become effective pursuant to" RCRA.  42 U.S.C. § 6972(a)(1)(A) (emphasis added).  MARAD contends that Plaintiffs do not argue that MARAD is *currently* in violation of any permit, standard, regulation, condition, requirement, prohibition, or order, but only that MARAD *may* violate such if the remaining vessels are transported to the U.K.  Thus, MARAD argues that Plaintiffs' RCRA case must be dismissed because there is no allegation that MARAD is *currently* in violation of RCRA and Plaintiffs cannot proceed under Section 6972(a)(1)(A) of RCRA for a "potential" violation that has not yet occurred.

---

Plaintiffs filed their motion for a TRO, 60 days had not yet passed from the time Plaintiffs filed their notice of intent to sue under TSCA; thus "any claim made *directly* under TSCA would be premature."  *Id.*

[13]  A similar allegation against the Environmental Protection Agency ("EPA") is contained in paragraph 15 of the Second Amended Complaint but is not relevant to this decision as the cross-motions for summary judgment are filed only between MARAD and the Plaintiffs.

Plaintiffs respond that their claim is ripe because it alleges that "conditions exist that *present or may present* an imminent and substantial endangerment in violation of RCRA." Pls.' Reply at 3 (citations omitted). The quoted provision comes from 42 U.S.C. § 6972(a)(1)(B), which authorizes a different cause of action entirely.[14] The provision at § 6972(a)(1)(A) authorizes a civil action for ongoing violations of specific RCRA requirements. In contrast, the provision at § 6972(a)(1)(B) authorizes suit against any "past or present" generator or transporter of waste, or site owner, whose past or present activities "may present an *imminent and substantial endangerment* to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). In both cases, if the allegations arise under Subchapter C – dealing with hazardous waste – no 60-day notice is required. *See* 42 U.S.C. §§ 6972(b)(1)(A), 6972(b)(2)(A).

There are two kinds of MARAD activities that might be said to be at issue under Plaintiffs' RCRA allegations. First, there was the original tow of four elderly ships to Teesside U.K. in October 2003, as allowed by the Court's TRO (although this tow was completed before Plaintiffs amended the complaint to include RCRA allegations). Second, there are MARAD's future plans to transport additional aging ships to Teesside. Neither of these contested actions comports with Section 6972(a)(1)(B), which speaks to a potential "imminent and substantial" harm from a present

---

[14] 42 U.S.C. § 6972(a)(1)(B) provides that any person may commence a civil action on his own behalf:

> against any person, including the United States . . . , and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal or any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . ."

or past activity.  There is no longer any potential "imminent and substantial" harm in the United

States from MARAD's *past* tow of four JRRF ships to Teeside U.K. in October 2003, with or

without the appropriate notice to EPA and agreement from the U.K. to receive the ships.  There is

no *present* activity in which MARAD is engaged that threatens a potential "imminent and

substantial" harm in the United States that arises from the absence of an agreement from the U.K.

to accept additional ships from the JRRF.  While a finding of "imminency" does not require a

showing that actual harm will occur immediately, the risk of threatened harm must be present.  *See

Craig Lyle Ltd. P'ship v. Land O'Lakes, Inc.*, 877 F. Supp. 476, 482 (D.Minn. 1995).  Here,

MARAD has stated that it will export the remaining vessels to Teeside "[o]nly if and when the

evaluation results in a determination that the AbleUK facilities are operating in a safe and

environmentally responsible manner . . . ."  2004 EA at 58.  Because MARAD will not export the

vessels until the United Kingdom Environmental Agency "has fully approved AbleUK to receive

and process the vessels," there is no threat of "imminent and substantial" harm.  *Id.*

Without the future cast of a threatened but not realized "imminent and substantial

harm," the Plaintiffs' RCRA claims must be reliant on 42 U.S.C. § 6972(a)(1)(A), which requires

a current and ongoing violation of a RCRA standard, order, requirement or the like.  Yet there is no

current and ongoing violation of MARAD's statutory obligation to notify EPA that it intends to

export hazardous wastes and to receive the agreement of the receiving nation, the United Kingdom,

to accept those wastes.[15]

For these reasons, the complaint allegations arising under RCRA must be dismissed.

---

[15]  The Court notes that MARAD argues that the ships are scrap metal and therefore not "hazardous wastes" covered by RCRA but assumes, for this point, that they are.

## IV. CONCLUSION

For the reasons stated, Defendants' motion for summary judgment will be granted and the complaint will be dismissed.  A memorializing order accompanies this Memorandum Opinion.

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge

DATE: March 2, 2005.